On behalf of the public, this is J. Laurence Kienlen, on behalf of the defendants, this is David P. Coughlin. Good morning, justices. My name is Larry Kienlen. I'm sorry for the mispronunciation. And I am the sole shareholder of the plaintiff. As the Court is well aware, I filed a complaint to collect attorney's fees that have been unpaid. From a reading of the transcript, it's apparent that the trial court bases its decision on discretion rather than on a manifest way of the evidence. As the judges set forth in the transcript of his opinion, they've been in a chancery court. And in a chancery court, he would be hearing these foreclosure actions where the attorney's fees are discretionary. The court can use its own knowledge rather than the evidence that's ascertained from the trial as to whether or not the attorney's fees are appropriate or not, and adjust them accordingly. When you have a contract action for attorney's fees, as is in my case, he has to rely on the evidence that's introduced in trial. On the one invoice, he did rely on the evidence by saying that there was no agreement, because he relied on the testimony of the wife that there was no actual agreement on the contract action, correct? That was, well, he didn't, he didn't, he just, he said that there was no contract. And in that particular instance, what he failed to rely upon is there was an evidence, there was a discovery deposition that was introduced into evidence, was admitted into evidence. And in that discovery deposition, Michelle Gallegos admitted that she had asked me to represent her. But, counsel, you did not use that to impeach her trial testimony, though. It was introduced into evidence, but does the record reflect that it was used to impeach her testimony? It was, the deposition was already introduced into evidence. If I would have attempted to have that read, and it was already there, I didn't need to read it again. Well, you did not, when you try to impeach someone's testimony, do you not call their attention to, you know, Ms. Witness, did you give a deposition on such and such a day? I don't want to take up the time. You know how to, how one would do that, and then call their attention to a particular sentence that would be contrary to the trial testimony. You know, was that your testimony on the date you gave the deposition? Are you testifying to something different now? Isn't that the use of impeachment? I mean, why would you rely on the trial court to, how would the trial court know if you were using it as impeachment or for some other purpose, if it was just in the record? Well, the trial court had read the transcript because it was in evidence, and the requirements were that I had to deliver the exhibits. Counsel, I'm going to have to ask you to speak up. I'm not sure if it's my hearing or the microphone or the size of the room here. Just keep your voice up a little bit, please. Yes, the exhibits had been delivered to the court several weeks before the trial, and like I say, they were all admitted into evidence. All right. But my point is, even if it's in evidence, counsel, did you not have to do something further? I didn't believe that I did because it was already in evidence. But you would agree that she testified contrary to the deposition? She testified there was no agreement. I don't think that she testified. That was not her testimony, that there was no agreement. What she testified to was we had a meeting with her husband, a person by the name of Don, and her. And what she testified to was at that meeting she did not agree to have me represent her. She said nothing about that. Nothing was said, period. She never testified that she never agreed to retain me for services. And the record will also show from the timesheets that were admitted into evidence that we had four in-person conferences and we had ten telephone conferences with regard to that particular matter. But there was an engagement letter that was never executed. The engagement letter was prepared towards the end of our dialogue. When I first received the information from the other attorney, I sent it to her, and then I immediately talked to her on the phone. And she said that she wanted me to represent her. And then based on that, we set up the second meeting. We had a couple of more telephone conferences, and then we had a meeting with the three of them. And her only testimony with regard to me representing her was that she said nothing about me representing her at that particular meeting. So I'm just trying to get to the bottom line. And that is, you're saying there's no evidence in the record upon which the trial court could reasonably find that there was no contract. That's correct. Okay. And based on all of the interaction that we had together, it's unreasonable for the court to make that conclusion. And finally she said, well, my husband is not going to allow me to retain your services. He's not going to allow me to give you the $10,000 retainer that was set forth in the engagement letter that I had given her a couple of weeks before that. On the 1014 invoice, the trial court basically adapted the objections that were filed by opposing counsel, which really went to what expenses or what attorney's fees were reasonable and necessary, correct? Those objections were not based on any evidence introduced at trial. No, no. I'm just trying to get to the legal issue here. I mean, when you have attorney's fees and you're suing on breach of contract, one of the elements is that the attorney's fees were reasonable and necessary, correct? Correct. Okay. And the trial judge, whether there's evidence of it in the record or not, based its decision on what it felt was reasonable and necessary. Correct. And the trial court said, counsel, you were my question is, I'm going to go. Well, a count stated. You had two counts in the complaint for a count stated. One on each bill. Right. And then the other count was for breach of contract. But you do not argue on appeal that you made a case for a count stated. No, I'm not making that. My case, my argument in my appeal is breach of contract. Okay. I just wanted to make sure that I wasn't missing something. Okay. Thank you. But you did say now that there's no evidence to support the reasonableness and necessity, to support the objections of reasonableness. That's correct. There was no evidence introduced into trial with regard to any of those objections. Those were just merely the impressions of the arguments of the scrivener of the person that wrote them. It wasn't based on evidence. Did you ask for a hearing with regard to that list of objections? The judge wouldn't even let me talk. The trial was over. This was like he asked in the record. He asked for written arguments, and then he told us how he wanted us to state it. The trial itself was over. We had introduced all of the evidence that they felt was necessary and I felt was necessary. And then in their post-trial submission to the court, they raised all kinds of issues that had not been brought up in trial. And you didn't make a motion to reopen? No. As a matter of fact, the way the judge conducted himself during the trial when I was seeking to impeach her on the fact that she said that she had previous attorneys that she had that didn't charge them for interoffice communications and there was only one attorney involved, I impeached her. And the judge, as you can read from the transcript, cut me off. He said, you impeached her. That's enough. I don't want to hear any more about it. And when he made his findings and his judgment, I got the impression that any further interaction with this particular judge was going to be beneficial and I just wanted the appeal. Well, when the judge ruled that he was adopting the objections and then he made a comment that if you can't agree on these numbers or these amounts or whatever, I'll be here all day and I'll hear whatever you have to say or something to that effect. You didn't take that as an opening to say to contest the numbers? No. No. He said that he approved each and every objection, period, end of story. Now, he said that there was some discrepancies in her numbers and he told us to not the objections themselves but the numbers. So then we went back into chambers and based on his ruling that he adopted each and every of her objections, it was easy to come to the conclusion what the number was according to that ruling. But he certainly didn't open the door for any further conversation. As a matter of fact, when he started talking about he was accusing me of violating the Illinois Fraudulent Transfer Act and I wanted to say something. He cut me off. He didn't want to hear anything. I just knew that it was fruitless for me to try to do anything more with this particular judge at that point in time. He had made his rulings and it was not based on the evidence. It was as though he had all the discretion in the world to make his rulings. For instance, his main thing was, hey, you were hired to vacate a settlement agreement. Well, that's not the case at all. The written agreement says that we were hired to take care of all matters with regard to this pending federal litigation. And in conjunction with that, what did you need to do, counsel? The first thing we needed to do, well, in that particular case, the other side had already gotten leave of the federal court to file a motion to enforce the settlement agreement. So we knew we were going to have to defend that. Now, this wasn't a case that had been pending for a couple of months. It had been pending for two and a half years. There was 197 entries in the federal docket, some including 30-page opinions. And, like I say, based on 30-page opinions, we had a lot of pleadings that were on file. The gender discrimination lawsuit had been dismissed, but there were still pending violations of the Illinois minimum wage law and the Federal Fair Labor Standards Act. So, anyway, we had to prepare for that. It resulted in a trial that lasted for three hours. There were five witnesses. So the first thing we had to do was resist the motion that they filed to enforce the settlement agreement that had been supposedly entered into and the court had approved.  And since at the time that the settlement agreement had been entered into, the matter had already been set for trial, the court had reserved five days to try this matter, we knew that if we were successful in defending the motion to enforce the settlement agreement, we were going to have to go to trial shortly thereafter. What was the time frame? It was like a week. The pretrial conference was set, like, it was removed a couple of days because of the settlement conference that the settlement agreement had been entered into. So, I mean, it was imminent. So we felt that if we were successful, that we would have to be ready for trial, but the court wasn't going to give us six months. Now, the court eventually did give us about six months before we had to prepare for trial. And in the meantime, we had to review everything that had gone on for the previous two-and-a-half years. Isn't one of the things that the trial court was concerned about was the need or necessity of multiple attorneys doing some of the tasks that were listed in the billing statement? I mean, many of the objections had to do with this wolf-in-wolf doing things. They kept complaining about $900 an hour for the three attorneys. There was never one instance where the attorneys all charged for the same work. The interaction between myself and one of the other attorneys was minimal. They engaged the three of us in their engagement letter. Our first in-person meeting with Michelle Gallegos and John Gallegos, one of the wolf attorneys and I were there for a two-hour meeting. Subsequent to that, we entered into the written engagement letter. They hired the three of us to perform this work. That was the contract. Now, for the court to decide, well, you didn't need three attorneys to motion to vacate a settlement that they hadn't agreed to, we were retained to do a lot more than that. We were retained to handle all matters of the federal lawsuit. Only the first thing, the smallest thing, was to resist the motion to enforce the settlement agreement. You had mentioned that before. I just have one very quick question. It almost calls for a yes or no answer. You say that the trial court erred in denying your fees for estate planning based upon its Fraudulent Transfer Act comments. Isn't it a fact that you actually were awarded some fees for the estate planning? Is it related to the second property but not the house? No. You were not awarded $450? No. I was not awarded one dime. I did not get one dime for any estate planning services. Oh, wait. The objections indicate that they're asking for a reduction of four hours. The judge's ruling was that there would be no compensation for estate planning services. Was that $450 included in the $18,000 or was it not? There was a grand total of like $18,000, correct, that was awarded to you? Yes. It wasn't the $450 included in there. The $450 for what? Well, I mean, I'm looking at their objections. Between 815.16 and 1013.16, charges for estate planning, and they're saying they were objecting to the house being anything you did with the house because the house had already been in trust. But they said basically that putting the second property into the trust, you should be compensated for it. So they asked for a reduction of four hours and for a charge of $450. The remaining charge would be paid, $450. I understand. But in addition to that, the judge says there is to be no compensation for estate planning services. Okay. My question is, was the $450 included in that amount?  We took away all the estate planning services. Okay. All right. Counsel, your time is up. The buzzer went off, but you'll have time on rebuttal. You'll have more time as well. Okay. Thank you. Mr. Cutler? Thank you, Your Honor. Forgive my allergic voice. My name is David Cutler. I'm representing the defendant of Pelley's, John and Michelle Gallegos, and Goldring Corporation. Your Honor, as you well know. So were all the estate planning charges eliminated? I don't know, Your Honor. I honestly don't know. That discrepancy that you point out, it would appear that some of that payment was made. I mean, you have exhibits in the record with all these handwritten notations on it with the hours, and my understanding of this in reading it along with the transcript is that the handwritten notations have to do with what you're willing to pay, what your clients are willing to pay. For instance, and then when it gets to the estate planning, the dates that I listed toward the end, someone wrote, is it legal to do this, question mark, and then there's a $450 there, which according to the objections, you were not objecting to $450. You were agreeing to pay $450. Your Honor, not to pass the buck, but those entries were made by Attorney Sparrow, and I was not present, and I have not spoken with her. I take it on faith that she's a practicing attorney and she was doing what the judge asked her to do. The judge reviewed her suggestions and adopted them. Now, if that somehow transgresses the earlier ruling that there was no money to be paid for the transfer, then so be it. I think that's water under the bridge. As I was saying, the plaintiff had the burden of proof in the trial court to show that his bills were reasonable and necessary, and he did not meet that. Now, the review that this Court has, as you are more well aware than I, is whether the rulings were against the manifest way to the evidence. Well, specifically with regard to the trial court's finding that this Federal court case was straightforward, I mean, one, that certainly was a finding the court made in hindsight, but wasn't there evidence in the record of the engagement letter? And didn't the engagement letter, the evidence of this engagement letter, point out? It didn't say anything specifically about the settlement agreement and that they were going to resist the settlement agreement, but it really talked about with regard, representing you in all matters pertaining to your dispute with the attorneys, with regard to their representation of you concerning the lawsuit in Federal court. I'm paraphrasing there. So there isn't anything in evidence that that was the only thing that they were retained to do. I would respectfully direct your attention to the transcript in which the judge asked the plaintiff, what was the primary purpose for which you were hired? And the plaintiff said, what I was hired for, to use his words, first and foremost, were to vacate the settlement agreement that the defendants were not happy with. Now, that particular job was a binary issue. That is what the judge below pointed out. The question was, was the judge or was the attorney who had entered into the agreement ready to be on board and say, you know, I made a mistake, or was he not? I mean, we always use war as an analogy to trial. But the question here was, is this going to be a commando raid or a siege? Because the lawyer was on the side of the defendants, this was going to be a commando raid. And the primary purpose out of the plaintiff's own mouth for which he was hired was an easy and straightforward task. Now, in addition to that, I would point out that that engagement letter also promised to provide periodic billing. The billing was not provided periodically. The plaintiff claims it's because he was told not to. I've been practicing 40 years. I've never had somebody tell me not to bill him for two years. The judge said on page three, sending out a bill two years later is a breach of contract. I mean, it simply is. The judge looked at the bill. He looked at the objections to the bill. What he did was thoughtful and based on evidence. And unless the court is prepared to say, in looking at this evidence and the like, most favorable to the prevailing party, that an opposite conclusion is clearly apparent or the fact finders, the judge's finding is palpably erroneous, wholly unwarranted, clear to the result of passion or prejudice, or arbitrary and unsubstantiated by the evidence, you can disagree with it. But with respect, it should be upheld. Let me ask you if the trial judge's ruling is based on the evidence. The trial judge says I've heard all the testimony and I'm adopting everything in your objections. How is that based on the evidence? I mean, for instance, the one notation in your objections, 11-5-2014, downloading the documents takes no longer than half an hour. Where's the evidence of that? Who testified to that? These aren't sworn statements. This is just a filing, a response to pleading in a case. So who – and the judge is adopting that the downloading of documents took no longer than half an hour. Who testified to that? I won't tell you that anyone testified to that. I'll tell you that that is a matter of judicial notice, that anybody who's downloaded documents has an idea of what downloading documents consists of. Well, it gets to the issue of counsel's argument, which is the trial court using its discretion, looking at this whole ball of wax and saying, you know, I think these fees are worth $18,000, not $33,000, which happens in divorce cases and things of that nature, whereas this is a breach of contract action and there has to be evidence to support the trial judge's ruling. I mean, you'd agree with that, correct? I would agree with that, but I would also stress that it was the plaintiff's burden to prove that his bills were reasonable.  Now, as to the – as Your Honor pointed out, the invoice for October 26, 2016, the fact that that was rejected relied on the testimony of Michelle Gallegos. And for counsel to say that there is no basis for that is simply wrong. So it wasn't the deposition in the record? Yes, Your Honor, it was in the record. But as Your Honor pointed out quite correctly, it wasn't used in court. And used in court is a term of art and it has to be used, as Your Honor pointed out, to impeach someone or read into evidence like an evidence deposition. Simply making it a part of the record, every attorney would do that in a heartbeat and then look to be reimbursed for all their deposition costs. It's not the law and it's not practical. Counsel argues that there was no evidence in the record that there was no contract. There was Michelle Gallegos' testimony that she didn't sign up with the plaintiff. Now, she had the meeting and she was thinking about it in her words and she said, my husband won't let me, I don't have the $10,000. She did not sign up with him. There was no signed engagement letter ever produced. It's he said, she said. The judge heard the testimony and that is exactly what a trial judge does. And it is, with respect, it is not the appellate court's job to do an independent stand-in review of all that evidence. He was in a better position to weigh it. He did so and he made the ruling. And unless it was palpably erroneous, wholly unwarranted, a matter of passion, prejudice, or arbitrary and without evidentiary basis, it stands. Now, the other thing is that, you know, the judge, he looked at this evidence, but he didn't look at it in a vacuum. As he said himself, he had been a practicing attorney for 23 years and had billed countless hours, as most of us have, and he hated it when insurance companies would cut the bill. We've all, well, I've had that and it's a real pain in the neck. He said, in his words, he hates to cut bills. He loathed having to do this. He said he's looked at over 1,000 bills while serving as a judge and has cut three of them, three. And this is number four. This is not a wild man who's out trying to break somebody's back. This is a man who applies his considered judgment, his background as both an attorney and a chancery judge, and applies it to the facts as he sees them. And you can disagree with how he sees them, but he sees them and he tells you exactly why and how, and unless it is. How much judicial notice does a prior civil practitioner get to bring to the bench? Well. I mean, you said, you know, we'll just chalk this up to judicial notice. How much is judicial notice? How long it takes to take a deposition? This was too many questions. I don't see the relevance of these questions. Is that, and therefore deduct time from a deposition? At what point has the trial court gone too far? Your Honor, you're introducing the fallacy of the beard, and I respect that, but I can't tell you how many heirs make a beard any more than I can tell you exactly how much time. But you suggested that for him to say it doesn't take more than a half an hour to download documents, that's judicial notice. When my colleague asked you, where's the evidence of that? I freely admit there is not actual evidence. What I will say is we all download documents. My kids download documents. Not one of them is a lawyer. And that's a personal experience, I think. And I, some people will say that you can take that as gospel. Some people might not. But I suggest to you it is not palpably erroneous, and it is not without evidentiary basis in experience. In experience. Exactly. Now, again, this is a judge who didn't do this lightly. If you listen or if you read his ruling, it's extremely candid. And he tries to lay it out, and he's trying to apply fairness to the evidence that he sees and he weighs. And I think he's done a fair job. And it simply, on its worst day, viewed from the standpoint and the light most favorable of the prevailing party, it doesn't meet any of those requirements that would have it overturned. It isn't viewed in the light most favorable to your side, but it's viewing evidence, not, gee, this is what I think. And I guess I'm asking you, where do we draw the line? Where do we say that's okay? Well, if the record were littered with the judge saying, oh, I think this, and oh, I think that, and everybody knows this, and everybody knows that, I would have some trepidation. But because he used it sparingly, it's okay? Well, a single incident, a single incident about downloading, about which I, a technological dinosaur, have familiarity, everybody has to know it. But there's 29 paragraphs in the objections that the trial judge, you know, all the trial judge did was adopt this filing of 29 separate objections. Yes. Yes, he did. And, again, that was based on his review of them as well as his review of the witnesses. And the whole, I think, the whole bundle, as you said, the whole ball of wax, I think, has to do with work that was done. It was done over two years. There was no high sign any time during that time of what the bill was going to be. In the judge's words, that constituted alone a breach of contract. I mean, if he were to really adopt that, he could have just said, forget it, no payment. Instead, the plaintiff got 54% of his billings. Was it argued that the contract, that the plaintiff had breached the contract? No. No one raised that. But I believe the, yes, I know a judge, or Attorney Sparrow said that the bill was, quote, horribly delayed, close quote. I mean, a two-year bill, seriously, that's, that is not a good practice. And according to Michelle Gallegos, she regularly asked for a copy of the bill so she could, quote, know where I'm at, unquote. And he kept saying he'd get it together, he'd get it together. Well ---- Wait a minute. Didn't you say that she told him that she never hired him, and yet you're saying she asked for a bill? We're talking about two different invoices. Okay. Oh, I'm, I'm mistaken. Yes. The first invoice is the Federal court case. The second invoice was October 20. You're right. The Bacon matter. Well, for these and the reasons set forth more fully in our brief, we would respectfully ask the Court to affirm our, the ruling below. Thank you. Just very quickly, would you agree that the procedure was, as counsel outlined, that the trial, the trial judge heard all the evidence, heard all the argument and then came back and ruled, and then when the trial judge made its ruling, then he said, I'm adopting these objections, go in the back and figure it out. Was that the procedure? Go in the back and figure out the numbers. Yes, I believe. So, I mean, the evidence, the evidence and arguments had been completed, the trial judge ruled, and part of the ruling was, was adopting these objections. Yes. And, and they, but they had to go back, as he said, on at least two occasions during the, during his ruling. The numbers don't work out. And so, make sure that they, they're correct. Thank you. Thank you again, Your Honor. Mr. Kinlan. Justice Burke, with regard to your, the notes that you see on, I believe it was the objections, those are, those are Judge Jerome's notes, those were not Attorney Sparrow's notes. The, the objections themselves were prepared by Attorney Sparrow. But, but the, whatever writing, and, and when I saw the exhibits, I saw that those were Judge's writings were on there. We didn't have that when we went back into the, into the conference room and worked out the numbers. We didn't, we didn't see what he had written on that piece of paper. We only were relying on what he verbally told us in court. And then that was placed into the, into the court file at the conclusion of the proceedings, or at some point? The, his notes? His comments. Well, that, that was, that was, yeah, he, he, when we asked for the, the file to be prepared for the appellate court, that was automatically included. The, the exhibits were not included. I had to go in on a motion to have those included subsequently when they, they were. It's true, when the, I, I did say that the first thing that we had to do was defend the motion to enforce the settlement. First and foremost. Yeah, well, that was the first thing we had to do. I, I did add the word foremost. But, but clearly, we had to do a lot more than that if we were successful in defending that motion. You know, the retainer agreement said we were going to handle all aspects of this federal litigation, plus we were going to handle all aspects of any disputes with this previous law firm. And again, with, with, with regard, with regard to the, I'm sorry, did I interrupt? Was the, well, remember what you were going to say. Was the imminency of the trial date made part of the record during any part of the hearing? In terms of what, during this testimony that you gave, did you let the court know the time frames? The, the, the time, all of the, the, the record of 197 entries was one of the exhibits introduced into evidence. And that record indicated that the five days were set aside for the, for the. And the date? And the date was there as well, yes. And the date of the pretrial conference, all of that is, is, is in the record, yes. In her answer to the complaint, and the answer is 827, and then, and also in C75, paragraph 2, the defendant, Michelle, admits the allegation set forth in the complaint that on July 24th, she contacted me and requested that I represent her with regard to the lawsuit being contemplated by Irene Bacon. And then we had four in-person conferences. We had ten telephone conferences. We had my interaction with the attorney on the other side, all based on her request that I represent her. So we didn't need a written contract. We had a verbal contract, and I relied on our verbal contract to perform the work that I performed. During that initial, it was never disputed that in our initial conversation, I told her that my rates had gone up to $350 an hour. She said, that's fine. That's what the other attorneys were charging us. And that's in the record too. And then, and then also it's corroborated by her discovery deposition that was introduced into evidence that she admitted that she had retained me to represent her in the Irene Bacon matter, which is the matter regarding the second bill. In the engagement letter that you quoted regarding the first bill, what does it say about the state planning work? Nothing. There was something else that came along. Right, and the trial judge, when the trial judge was talking about the fraudulent transfer act, ended that colloquy by saying, and you had no agreement to do that. Well, they, let me just say, they asked me to do the work. The record was clear that they asked me to do the work. The record's clear that I did do the work. The work that I did do was admitted into evidence as the exhibits. So again, we had a request for me to do services. I did the services. I charged them the same rate that I'd been charging them all along, and they accepted the work that I did do. They signed it. They signed the transfer documents. Now, as far as transfer, what we did was, as far as the estate, the only estate planning services I did are things that they specifically requested me to do, which was change the beneficial interest in the land trust from John and Michelle to Michelle and her children as contingent beneficiaries and transfer a piece of real estate into the trust that already contained their home. Now, as far as them being insolvent at the time, there was no evidence of that. The evidence was introduced that now he had become the sole shareholder, the sole owner of the restaurant. They had already paid the first judgment, $145,000. That was already paid for. The only thing that was even considered at this point in time was this new allegation from the attorney about the Irene Bacon matter. But there was never any discussion of them being insolvent or John being insolvent, not being able to pay whatever was coming up. Excuse me, counsel. The buzzer has gone off. If you want to conclude. Well, I... Do you have any other questions? Because of the questions, I didn't get to my other point. Well, I know that's the problem with oral argument, but we certainly have... In any event, in conclusion, the judgment of the court was not based on evidence. It was based on his opinion. It was based on he thought he had great discretion. I think that was because he was new to the law division. He had come from the chancery division. In most of his cases, attorney's fees, he had great discretion. But in a contract action for attorney's fees, the judgment has to be based on the evidence. Thank you, counsel. Thank you very much. I appreciate it. Thank you both for your arguments this morning. The court will take the matter under advisement and render a decision in due course. We stand in recess until the next case.  Thank you.